**UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| GAYLE PEARLSTEIN, BRIAN CHILDS, KAMAL KISHORE, TIMOTHY VIK, JOSEPH SCHIAVONE, VOODOO FIREARMS, SHOOT SHOP TRAIN INC., d/b/a SHOOTING SPORTS, SACKY'S FIREARMS, ILLINOIS STATE RIFLE ASSOCIATION, and NATIONAL RIFLE ASSOCIATION OF AMERICA,<br><br>  *Plaintiffs*,<br><br>  v.<br><br>KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois, and BRENDAN F. KELLY, in his official capacity as Director of the Illinois State Police,<br><br>  *Defendants*. | Civil Action No. _____ |

**PLAINTIFFS' COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF**

Gayle Pearlstein, Brian Childs, Kamal Kishore, Timothy Vik, Joseph Schiavone, Voodoo Firearms, Shoot Shop Train Inc., d/b/a Shooting Sports, Sacky's Firearms, the Illinois State Rifle Association, and the National Rifle Association of America (collectively, "Plaintiffs"), by and through undersigned counsel, hereby bring this civil action against Defendant Kwame Raoul, in his official capacity as Attorney General of the State of Illinois, and Defendant Brendan F. Kelly, in his official capacity as the Director of the Illinois State Police. Plaintiffs allege the following based on personal knowledge as to all facts relating to them, and on information and belief as to all other matters.

1

**INTRODUCTION**

1.       This suit challenges an Illinois law, 720 ILCS 5/24-3(A)(g), that forces law-abiding adults to wait 72 hours before they can acquire a firearm even if they pass a background check instantly, as most do.  Illinois's law does not purport to be tethered to the time it takes to run a background check, or to any other investigatory efforts into whether someone is disqualified from exercising Second Amendment rights.  It is instead just an unadorned effort to delay the exercise of Second Amendment rights, on the theory that people who seek to acquire firearms are likely animated by violent intentions that may subside if they are forced to "cool off" for three days.

2.       That kind of "cooling-off period" measure has no historical pedigree whatsoever—and, indeed, would have been unimaginable at the Founding.  To be sure, a few states adopted waiting periods to acquire a firearm in the early twentieth century to facilitate the advent of then-novel background checks, which at the time were a cumbersome and time-consuming endeavor. But some of those measures were abandoned as background checks became easier to process, and federal law now takes the opposite approach, imposing a three-day *limit* on how long a background check may delay the acquisition of a firearm.  Pure "cooling-off" laws did not emerge until the late twentieth century, and most of the few currently on the books date back only to the twenty-first. That is not because it took two centuries to reach the unremarkable conclusion that some small number of the many people who seek to acquire firearms want to do so for illicit (and immediate) purposes.  It is because generations of lawmakers have recognized that delaying the exercise of Second Amendment rights simply because the government is wary of anyone who wants to exercise them is fundamentally incompatible with the fundamental right to keep and bear arms.

3.       720 ILCS 5/24-3(A)(g) burdens the people's right to keep and bear arms in an ahistorical manner for an ahistorical reason and is at odds with the Framers' decision to entrust the people with arms.  The Court should declare it unconstitutional and enjoin its enforcement.

**JURISDICTION AND VENUE**

4.     The Court has subject-matter jurisdiction under 28 U.S.C. §§1331 and 1343 because Plaintiffs allege that 720 ILCS 5/24-3(A)(g) violates the United States Constitution and seek relief under 42 U.S.C. §1983.

5.     Venue is proper in this District under 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claim occurred here.

**PARTIES**

6.     Plaintiff Gayle Pearlstein is an adult resident of Illinois.  Pearlstein, who possesses an Illinois Firearm Owners Identification ("FOID") card pursuant to the Illinois Firearm Owners Identification Card Act, 430 ILCS 65/1 *et seq.*, sought to acquire a firearm for self-defense purposes and passed a background check, but was unable to acquire the firearm for 72 hours because of 720 ILCS 5/24-3(A)(g).

7.     Plaintiff Brian Childs is an adult resident of Illinois.  Childs, who possesses an Illinois FOID card, sought to acquire a firearm for self-defense purposes and passed a background check, but was unable to acquire the firearm for 72 hours because of 720 ILCS 5/24-3(A)(g).

8.     Plaintiff Kamal Kishore is an adult resident of Illinois.  Kishore, who possesses an Illinois FOID card, sought to acquire a firearm for self-defense purposes and passed a background check, but was unable to acquire the firearm for 72 hours because of 720 ILCS 5/24-3(A)(g).

9.     Plaintiff Timothy Vik is an adult resident of Illinois.  Vik, who possesses an Illinois FOID card, sought to acquire a firearm for self-defense purposes and passed a background check, but was unable to acquire the firearm for 72 hours because of 720 ILCS 5/24-3(A)(g).

10.     Plaintiff Joseph Schiavone is an adult resident of Illinois and the owner of Plaintiff Voodoo Firearms, a firearms-related retail business and federally licensed firearms dealer located in Minooka, Illinois.  As the owner and operator of Voodoo Firearms, Joseph Schiavone faces the

3

threat of felony-level prosecution under the provisions of 720 ILCS 5/24-3(A)(g) if he fails to withhold delivery of a firearm for at least 72 hours after application for its purchase has been made by one of his customers, even if that customer passes a background check in the interim.

11. Plaintiff Shoot Shop Train Inc., d/b/a Shooting Sports ("Shooting Sports") is a firearms-related retail business and federally licensed firearms dealer located in Moline, Illinois.

12. Plaintiff Sacky's Firearms is a firearms-related retail business and federally licensed firearms dealer located in Willow Hill, Illinois.

13. Plaintiff Illinois State Rifle Association ("ISRA") is Illinois's leading advocacy organization dedicated to protecting Second Amendment rights, promoting firearm safety, and providing shooting sports education. Founded in 1903, ISRA operates as a non-profit and serves as the primary grassroots defender for firearm owners across Illinois, with its purposes including the securing of the constitutional right to privately own and possess firearms within Illinois. ISRA is incorporated under the laws of Illinois with its principal place of business in Chatsworth, Illinois. ISRA has more than twenty thousand members in Illinois, including Gayle Pearlstein, Brian Childs, Kamal Kishore, Timothy Vik, Joseph Schiavone, Voodoo Firearms, Shooting Sports, and Sacky's Firearms. ISRA members would lawfully purchase firearms for self-defense and other lawful purposes in Illinois without a "cooling-off period," but are unable to do so because of 720 ILCS 5/24-3(A)(g). ISRA brings this action on behalf of its members who have been and will continue to be harmed by Defendants' enforcement of 720 ILCS 5/24-3(A)(g).

14. Plaintiff National Rifle Association of America ("NRA") is a membership organization and non-profit devoted to protecting the right to keep and bear arms. Founded in 1871, the NRA is America's oldest civil rights organization and America's leading provider of firearms marksmanship and safety training for both civilians and law enforcement. The NRA has

4

millions of members across the Nation, including thousands of members throughout Illinois, including Gayle Pearlstein, Brian Childs, Kamal Kishore, Timothy Vik, Joseph Schiavone, Voodoo Firearms, Shooting Sports, and Sacky's Firearms. Protecting the Second Amendment rights of its members is germane to the NRA's organizational purposes. NRA members would lawfully purchase firearms for self-defense and other lawful purposes in Illinois without a "cooling-off period," but are unable to do so because of 720 ILCS 5/24-3(A)(g). The NRA brings this action on behalf of its members who have been and will continue to be adversely and directly harmed by Defendants' enforcement of 720 ILCS 5/24-3(A)(g).

15.     Defendant Kwame Raoul is the Attorney General of Illinois. As Attorney General, he is "the legal officer of the State" and has the duty to "institute and prosecute all actions and proceedings in favor of … the State," as well as to "defend all actions and proceedings against any State officer." Ill. Const. art. V, §15; 15 ILCS 205/4. Attorney General Raoul is a resident of Illinois, and he maintains an office in this District. At all relevant times, Attorney General Raoul, as well as those subject to his supervision, direction, or control, are and will be acting under color of state law. Defendant Raoul is sued in his official capacity.

16.     Defendant Brendan F. Kelly is the Illinois State Police Director. As Director, Kelly is "responsible for the management and control of the Illinois State Police." 20 ILCS 2610/2. The State Police are responsible for enforcing 720 ILCS 5/24-3(A)(g). Director Kelly is a resident of Illinois, and he maintains an office in this District. At all relevant times, Director Kelly, as well as those subject to his supervision, direction, or control, are and will be acting under color of state law. Defendant Kelly is sued in his official capacity.

5

**BACKGROUND**

**I.    "Cooling-Off Period" Laws Are A Late-Twentieth-Century Innovation That Remain Uncommon Today And Are Premised On Antipathy To Second Amendment Rights.**

17.    The Second Amendment provides that "the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  From the Founding to the present, federal and state authorities have grappled with the best way to respect that fundamental, pre-existing right while keeping firearms out of the hands of those who pose a credible threat to the physical safety of others.  In "the early days of the Republic," however, there was no "open, widespread, and unchallenged" practice, *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 36 (2022) (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 572 (2014) (Scalia, J., concurring in judgment)), of imposing a waiting period before someone could take possession of a firearm, *see, e.g.*, *Silvester v. Harris*, 41 F.Supp.3d 927, 962 (E.D. Cal. 2014) ("[T]here is no evidence to suggest that waiting periods imposed by the government would have been accepted and understood to be permissible under the Second Amendment.").[1]  To the contrary, courts recognized from the very beginning that "the right of the people to keep and bear arms" "necessarily involves the right to purchase and use them in such a way as is usual" whenever the need to do so arises.  *Andrews v. State*, 50 Tenn. 165, 177-78 (1871).

18.    Waiting-period provisions first came onto the scene in the early twentieth century, around the same time that some states started adopting various types of background checks.  *See Silvester v. Harris*, 843 F.3d 816, 831 (9th Cir. 2016) (Thomas, C.J., concurring); *Rocky Mt. Gun Owners v. Polis*, 701 F.Supp.3d 1121, 1137 (D. Colo. 2023) ("[N]o law requiring a waiting period

---

[1] The district court opinion in *Silvester v. Harris* was later reversed on other grounds on appeal, 843 F.3d 816 (9th Cir. 2016), but the Supreme Court abrogated the Ninth Circuit decision in *Bruen*, *see Baird v. Bonta*, 81 F.4th 1036, 1043 (9th Cir. 2023) (recognizing abrogation).  Plaintiffs cite the *Silvester* district court and court of appeals opinions for the purposes of their historical analysis.

was enacted in the United States until 1923."); David B. Kopel, *Background Checks for Firearms Sales & Loans: Law, History, and Policy*, 53 Harv. J. Leg. 303, 360 (2016) (same). These waiting periods were designed to facilitate the background-check process, which was a much more time-consuming endeavor back then. For example, California—one of the first states to enact such a law back in 1923—initially imposed a one-day wait for retail handgun purchases, during which dealers were required to provide information identifying the purchaser to the local police or county clerk. *Silvester*, 843 F.3d at 823-24. New Jersey, another early adopter in 1927, imposed a seven-day waiting period similarly requiring the dealer to forward the purchaser's information to the licensing authority for a background investigation. *See* Law of Mar. 30, 1927, ch. 321, §6(4)(b), 1927 N.J. Laws 742, 746. The District of Columbia followed in 1932 with a 48-hour waiting period requiring the dealer to forward the purchaser's information to the D.C. police within six hours. *See* Act of July 8, 1932, ch. 465, §8, 47 Stat. 650, 652. Three years after that, South Dakota passed its own 48-hour waiting period with a six-hour notification requirement. *See* Law of Mar. 14, 1935, ch. 208, §9, 1935 S.D. Laws 355, 357. In the 1970s, 1980s, and 1990s, waiting-period laws enjoyed a brief renaissance, as additional states sought to facilitate background checks in the pre-Internet era. *Silvester*, 843 F.3d at 824; *see also, e.g.*, *State v. Mendoza*, 920 P.2d 357, 368 (Haw. 1996) (Hawaii); 1975 Senate Bill 185, Wis. Legis. (Mar. 15, 1976), https://tinyurl.com/3f8xr6uy (Wisconsin).

19.     While these waiting periods helped facilitate investigations into the purchaser, they also came at a significant cost to law-abiding citizens. A New Jersey woman was fatally stabbed by her ex-boyfriend (against whom she had a restraining order) in 2015 while waiting for the state to process her application to own a handgun. Greg Adomaitis, *N.J. gun association calls Berlin woman's death an 'absolute outrage'*, NJ.com (June 5, 2015), https://tinyurl.com/mn32h8f. In

another sad episode, a Wisconsin woman was killed by her stalker before she could take possession of the handgun she was attempting to purchase. *See* Kopel, *supra*, at 309-10. These are not one-offs. As the Supreme Court recently reminded, "disarm[ing]" a citizen for "[e]ven [a] short period … can be deadly." *Wolford v. Lopez*, No. 24-1046, 2026 WL 1825723, at \*10 (U.S. June 25, 2026).

20. With the advent of modern federal background-check requirements and the National Instant Criminal Background Check System ("NICS"), waiting-period laws no longer serve an investigatory purpose, as most background checks are completed in a matter of minutes. Many states that previously required waiting periods have accordingly abandoned them over the past few decades, in recognition of the severe costs they impose on the citizenry. *See, e.g.*, 1995 Or. Laws ch. 729 (S.B. 1096) §13 (Oregon); 1997 Ind. Legis. Serv. P.L. 17-1997 §§6, 8 (H.E.A. 1669) (West) (Indiana; §6 repeals a seven-day waiting period while §8 adds an instant-background-check requirement); 2009 S.D. Sess. Laws ch. 122 (SB 70) §1 (South Dakota); 2015-2016 Wis. Legis. Serv. 22 (2015 S.B. 35) (West) (Wisconsin); *see also* Brendan O'Brien, *Wisconsin Governor Signs Bill Repealing Handgun Waiting Period*, Reuters (June 24, 2015), https://tinyurl.com/228uby2t (observing that "the instant national background check system makes the waiting period law obsolete," and quoting the then-Governor's remark that repealing the waiting-period law "allows Wisconsin's law to catch up with the 21st century"); Tenn. Bur. Invest., *Guidelines for Federal Firearms Licensees* 1-2, https://tinyurl.com/5yx9rc52 (last visited July 3, 2026) (noting that Tennessee's "fifteen-day waiting period between purchase and delivery of a handgun was eliminated effective November 1, 1998," the same day "[t]he Tennessee Instant Check Law became effective").

21. Federal law followed a similar trajectory. Congress initially mandated background checks for most firearm sales in the Brady Handgun Violence Prevention Act of 1993. Although

8

the Brady Act contemplated a nationwide system of instant background checks, the technology necessary to facilitate that system did not yet exist when Congress passed the law. So the Brady Act gave the FBI five years to lay the groundwork for what ultimately became NICS, and, in the meantime, Congress embraced a five-day waiting period to facilitate local law enforcement officials conducting cumbersome background checks. *See Printz v. United States*, 521 U.S. 898, 902-04 (1997). But mindful of the constitutional concerns with that approach, Congress abandoned the five-day waiting period once NICS came online and replaced it with an affirmative protection to ensure that delays in processing the checks would not impede the lawful exercise of Second Amendment rights: A licensed firearms dealer may proceed with a sale three business days after requesting a background check, even if the background check has not yet been completed. *See* 18 U.S.C. §922(t)(1)(B)(ii); *see also* U.S. Dep't of Justice, *Presale Handgun Checks, the Brady Interim Period, 1994-98* (June 1999), https://tinyurl.com/2nrdckfs.

22. While Congress and some states with waiting periods responded to the advent of NICS and related improvements to background-check processes by abandoning lengthy waiting-period laws, a handful of others responded by trying to re-justify laws originally intended to facilitate a background check. California is illustrative. After adopting a one-day waiting period for retail sales of pistols, revolvers, and concealable firearms in 1923, California extended the period to five days in 1965, and then again to 15 days in 1975, both times primarily "to allow more time for more extensive background checks." *Silvester*, 843 F.3d at 824. It was not until 1979 that the state even hinted (as a litigating position) that the law might serve a "cooling-off" function too. *See People v. Bickston*, 154 Cal.Rptr. 409, 410 (Cal. App. Dep't Super. Ct. 1979). And the California legislature did not expressly embrace a cooling-off approach until 1996. *Silvester*, 41 F.Supp.3d at 946-47. By then, California had switched to an electronic background check system

9

that allowed most checks to be processed far more expeditiously than previously. Although the legislature apparently recognized at that point that it no longer had a good justification to force Californians to wait 15 days to acquire a firearm, it still was not willing to trust law-abiding citizens who have passed a background check with a firearm. (Indeed, at the time, California was not even willing to admit that the Second Amendment protects the right to keep and bear arms.) So, California reduced its waiting period, but only to ten days, contending that law-abiding citizens should have to wait out a "'cooling off' period" before they can acquire a handgun, even if they have already passed the requisite background check. *Id.* at 947.

23.     The Ninth Circuit upheld California's "cooling-off period" law under the means-end balancing test it previously applied in Second Amendment cases. *Silvester*, 843 F.3d at 828. But *Bruen* subsequently rejected any role for means-end balancing in the Second Amendment context, abrogating the Ninth Circuit's decision and others applying similar tests. 597 U.S. at 22-23.

24.     To put it mildly, "cooling-off periods" do not sit comfortably with Supreme Court precedent—or our Nation's historical tradition of firearm regulation. *Bruen* explicitly cautioned against efforts to impose obstacles for the sole purpose of delaying a law-abiding citizen's ability to carry a firearm. *Id.* at 38 n.9. And *Rahimi* explicitly distinguished between permissible efforts to keep firearms out of the hands of "citizens who have been found to pose a credible threat to the physical safety of others" and constitutionally suspect efforts to "broadly restrict arms use by the public generally." *United States v. Rahimi*, 602 U.S. 680, 692 (2024).

25.     Fortunately, courts—and even some states—have recently recognized the constitutional problems with these sorts of laws. In 2024, New Mexico enacted House Bill 129, which requires "[a] waiting period of seven calendar days … for the sale of a firearm and the

transfer of the firearm to the buyer." N.M. Stat. §30-7-7.3(A). In 2025, the Tenth Circuit issued a published and precedential opinion "holding that [New Mexico House Bill 129] is unconstitutional." *Ortega v. Grisham*, 148 F.4th 1134, 1156 (10th Cir. 2025). And just a few weeks ago, the Attorney General of Florida and all 20 Florida State Attorneys agreed that the provisions of Florida law that "impose a three-day waiting period between the purchase and delivery at retail of any firearm … are unconstitutional under the Second Amendment." Offer of Judgment at 3, *Dunn v. Glass*, No. 8:25-cv-02264 (M.D. Fla. June 5, 2026), Dkt.45-1.[2]

## II.   Illinois's 72-Hour "Cooling-Off" Law.

26.     Unfortunately, the solicitude for the rights of the people embodied in the just-mentioned decisions has not yet reached the Land of Lincoln.

27.     Under 720 ILCS 5/24-3(A)(g), Illinois makes it a crime for any person to "[d]eliver[] any firearm, incidental to a sale, without withholding delivery of the firearm for at least 72 hours after application for its purchase has been made." The statute defines "application" to mean "when the buyer and seller reach an agreement to purchase a firearm." *Id.*

28.     This 72-hour period does not purport to be tied to the time needed to conduct a background check or perform any other kind of investigation into one's suitability to acquire a

---

[2] What is more, the only precedential post-*Bruen* opinion going the other way—*Beckwith v. Frey*, 171 F.4th 560 (1st Cir. 2026)—has been abrogated by intervening Supreme Court precedent. In April 2026, the First Circuit upheld Maine's 72-hour cooling-off law on the belief "that laws regulating the purchase or acquisition of firearms do not target conduct covered by the Second Amendment's 'plain text.'" *Id.* at 568. But in June 2026, the Supreme Court made clear that is the wrong question, and that *Bruen*'s textual inquiry looks simply to "what [the plaintiffs] want to do." *Wolford*, 2026 WL 1825723, at *9. If the answer is "carry []guns for self-defense," and if the challenged law makes that more difficult, then "the restrictions imposed by the challenged law fall within the plain text of the Second Amendment," full stop, regardless of "the purpose of the law." *Id.* Put differently, although the First Circuit may have thought that laws causing "a downstream restrictive effect … on the Second Amendment right" do not trigger historical scrutiny, *Beckwith*, 171 F.4th at 569, intervening Supreme Court precedent says otherwise.

11

firearm. In fact, the statute explicitly provides that the obligation to wait 72 hours before delivering a firearm does not "relieve[] a federally licensed firearm dealer from the requirements of conducting a NICS background check through the Illinois Point of Contact under 18 U.S.C. 922(t)." *Id.* The statute instead just requires everyone in the state to wait three days to acquire a firearm, even if they pass a background check in a matter of minutes (as most people do), and even if they already lawfully own a firearm and have long done so without incident.

29. Violating Illinois's 72-hour cooling-off requirement is "a Class 4 felony," 720 ILCS 5/24-3(C)(1), meaning that violators face prison sentences of 1-3 years, 720 ILCS 5/5-4.5-45(a).

30. 720 ILCS 5/24-3(A)(g) applies to all firearm sales in Illinois unless the seller knows the buyer works as a law-enforcement officer, a corrections officer, or a certain type of security guard; the buyer is licensed as a federal firearms dealer; or the buyer is a registered competitor or attendee at certain sanctioned competitive shooting events.

31. Indeed, 720 ILCS 5/24-3(A)(g) is one of the broadest "cooling-off" laws in the country. Several of the other states with such laws have an exception for buyers who have already secured a concealed handgun license; Illinois does not. *Cf., e.g.*, N.M. Stat. §30-7-7.3. Some states have an exception for people certified in hunting-safety seeking to buy a rifle or shotgun; Illinois does not. *Cf., e.g.*, Fla. Stat. §790.0655(2)(c). Other states allow law enforcement to waive the waiting period if the buyer is facing a threat to herself or her family; Illinois does not. *Cf.* Minn. Stat. §624.7132, subd. 4. Still others limit the waiting-period requirement to handgun sales; Illinois does not. *Cf., e.g.*, Md. Code Ann., Pub. Safety §§5-101(r), 5-123(a), 5-124(a)(1).

## III. 720 ILCS 5/24-3(A)(g) Harms Law-Abiding Residents And Federally Licensed Firearms Dealers All Throughout Illinois.

32. 720 ILCS 5/24-3(A)(g) has had severely deleterious impacts on both individuals and firearms dealers throughout Illinois.

33.     On July 6, 2026, Plaintiff **Gayle Pearlstein** traveled to the Suburban Sporting Goods store in Melrose Park, Illinois, a federally licensed firearms dealer, for the purpose of acquiring a new Masada Slim 9mm pistol. Exhibit A ¶8. Once there, Ms. Pearlstein provided the information required for a firearm background check through the State of Illinois's Firearm Transfer Inquiry Program ("FTIP"), passed the background check in a matter of minutes, and then paid the purchase price for her firearm.[3] *Id.* ¶¶9-10. At that point, the Suburban Sporting Goods employee who had been helping Ms. Pearlstein informed her that she would not be able to take possession of the firearm for 72 hours due to Illinois's cooling-off law. *Id.* ¶11. When Ms. Pearlstein asked if there was any reason other than the requirements of the cooling-off law why she could not receive the firearm and take it home with her, the employee responded that there were no other reasons. *Id.* ¶12. Ms. Pearlstein actively seeks to expand her ability to keep and bear arms; accordingly, even if she is able to take possession of the Masada Slim 9mm pistol, she intends to make future firearms purchases in the state. *Id.* ¶7.

34.     On July 7, 2026, Plaintiff **Brian Childs** traveled approximately 20 miles from his home to the JW's Shooting Parlor store in Geneseo, Illinois, a federally licensed firearms dealer, for the purpose of acquiring a new Mossberg Patriot Bolt-Action Rifle .350 Legend. Exhibit B ¶7. Once there, Mr. Childs provided the information required for a firearm background check through Illinois's FTIP. *Id.* ¶8. He passed the background check and subsequently paid the purchase price for his rifle. *Id.* ¶¶8-9. During the course of the transaction, the JW's Shooting Parlor employee who had been helping Mr. Childs informed him that he would not be able to take possession of the firearm for 72 hours because of Illinois's cooling-off law. *Id.* ¶10; *see also id.* ¶11. In addition to

---

[3] The FTIP is a system administered by the Illinois State Police that allows federally licensed firearms dealers to verify at the point of sale whether a prospective buyer is legally eligible to purchase and possess a firearm in the state.

this purchase, Mr. Childs actively seeks to expand his ability to keep and bear arms; accordingly, even if he is able to take possession of the Mossberg Patriot Bolt-Action Rifle .350 Legend, he intends to make future firearms purchases in the state. *Id.* ¶6.

35.     On July 6, 2026, Plaintiff **Kamal Kishore** traveled to the Pekin Gun & Sporting Goods store in Pekin, Illinois, a federally licensed firearms dealer, for the purpose of acquiring a Glock 17L Gen5 MOS 9mm pistol. Exhibit C ¶9. Once there, Dr. Kishore provided the information required for a firearm background check through Illinois's FTIP, passed the background check within minutes, and then paid the purchase price for his firearm. *Id.* ¶¶10-11. At that point, the Pekin Gun and Sporting Goods employee who had been helping Dr. Kishore informed him that he would not be able to take possession of the firearm until July 9, 2026, due to Illinois's cooling-off law. *Id.* ¶12. When Dr. Kishore asked if there was any reason other than the requirements of the cooling-off law why he could not receive the firearm and take it home with him, the employee responded that there were no other reasons. *Id.* ¶13. Given that Dr. Kishore is a Concealed Carry Firearms Instructor in Illinois, a handgun instructor for the NRA, and a Range Safety Officer, he intends to make future firearms purchases in the state. *Id.* ¶¶7-8.

36.     On July 6, 2026, Plaintiff **Timothy Vik** traveled to the Bass Pro Shop in East Peoria, Illinois, a federally licensed firearms dealer, for the purpose of acquiring a Savage Model 110 6.5 Creedmoor bolt-action rifle. Exhibit D ¶8. Once there, Mr. Vik provided the information required for a federal background check. *Id.* ¶9. He passed the background check and then paid the purchase price for his new firearm. *Id.* ¶¶9-10. During the course of the transaction, the Bass Pro Shop employee who had been helping Mr. Vik informed him that he would not be able to take possession of the firearm for 72 hours due to Illinois's cooling-off law. *Id.* ¶11; *see also id.* ¶12. Even if Mr. Vik is able to take possession of the Savage Model 110 6.5 Creedmoor bolt-action rifle

while this action is pending, he intends to purchase additional firearms in Illinois in the future. *Id.* ¶14.

37. 720 ILCS 5/24-3(A)(g) has also negatively impacted Plaintiff **Joseph Schiavone**, his business Plaintiff **Voodoo Firearms**, and its customers. Mr. Schiavone owns Voodoo Firearms, a federally licensed firearms dealer that specializes in providing firearms, tactical gear, survival equipment, on-site gunsmithing, and affordable FFL transfers to law-abiding citizens. Exhibit E ¶4. Mr. Schiavone and his staff at Voodoo Firearms assist their customers not only with firearm-related retail purchases, but also by promoting responsible firearm handling and ownership through firearm training classes. *Id.* Illinois's 72-hour cooling-off law has had a negative impact on the volume of sales of firearms and accessories at Voodoo Firearms, and in so doing has negatively affected the store's annual revenue. *Id.* ¶¶9-10. In addition to the loss of revenue, Mr. Schiavone and his employees face the prospect of investigation, arrest, and felony-level prosecution if they deviate from the requirements of the cooling-off law in any way. *Id.* ¶3.

38. Illinois's 72-hour cooling-off law has also harmed Voodoo Firearms' past, present, and future customers by preventing those in immediate need of a firearm for self-defense from acquiring one. *Id.* ¶12. One example of this occurred when a man came into Voodoo Firearms looking to purchase a firearm for self-defense after he was beaten by another man. Although the customer's attacker had been arrested and charged, the attacker was quickly released from custody under the provisions of Illinois's Safety, Accountability, Fairness and Equity-Today Act. *Id.* The customer was deeply concerned that his attacker would return to reoffend, and he wanted a firearm to defend himself. *Id.* Mr. Schiavone worked with the customer for over an hour picking out the right firearm that he would be comfortable with, as well as getting him signed up for some training. *Id.* The customer completed the background check successfully and paid for the firearm. Despite

all of this, because of the cooling-off law, Mr. Schiavone could not allow this traumatized crime victim to take possession of the very thing that might save him from a future and even more brutal attack. Mr. Schiavone has also had similar experiences with domestic violence survivors who have come into Voodoo Firearms looking to purchase a firearm to defend themselves and/or their children from their abusers. *Id.*

39. Plaintiff **Shooting Sports** has been similarly impacted by the cooling-off law and wishes to return to the standard practice of selling and providing firearms without arbitrary delay to customers who have passed their background checks. The statute prevents Shooting Sports from doing so and exposes its employees and agents to the prospect of investigation, arrest, and felony-level prosecution if they deviate from its requirements. Exhibit F ¶3. Moreover, Shooting Sports has experienced a drop-off in sales since 720 ILCS 5/24-3(A)(g) went into effect, *id.* ¶8, with more of the traditional in-store customers moving to online sales. Shooting Sports loses revenue through these online sales, receiving only a $30 "transfer fee" for each firearm sold. *Id.* The cooling-off law has also caused compounding harm to Shooting Sports' business (and the other gun store plaintiffs' businesses): With every firearm sale it loses because of the cooling-off law, the store loses the corresponding sale of accessories—which typically go together with traditional in-store firearm sales. *Id.* ¶9.

40. In addition to sustaining all these same injuries since 720 ILCS 5/24-3(A)(g) went into effect, Plaintiff **Sacky's Firearms** has also seen its ability to act as a first line of defense undermined by the cooling-off law. The owner and employees of Sacky's Firearms always endeavor to get to know the customers who come into their store to ensure that they are selling the right guns to the right people. Exhibit G ¶6. During these interactions, the customer's maturity and state of mind is evaluated to determine whether the customer might pose a threat to the

16

community or him/herself; just because a customer passes a background check does not mean they will be able to buy a firearm from the store. *Id.* Many of the denials of sale that Sacky's Firearms issues on its own are based on the belief that the individual wishing to purchase a firearm is a straw purchaser—something a traditional background check through FTIP would not be able to uncover. *Id.* ¶7. Because of this, Sacky's Firearms and the other gun store plaintiffs issue far more denials on their own annually than they receive through FTIP. *See* Exhibit F ¶7, Exhibit G ¶7. But, with more sales moving to the online forum due to the arbitrary burdens that the cooling-off law imposes on customers, the ability of Sacky's Firearms (and the other gun store plaintiffs) to conduct this critical in-store screening has been greatly reduced. *Id.* ¶8.

**CLAIM FOR RELIEF**
**Second Amendment Violation**
**42 U.S.C. §1983**

41. Plaintiffs re-allege and incorporate by reference the preceding paragraphs as though fully set forth herein.

42. "The Second Amendment protects the right of 'all Americans' to keep and bear firearms for self-defense." *United States v. Hemani*, No. 24-1234, 2026 WL 1751710, at *4 (U.S. June 18, 2026) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008)); *see* U.S. Const. amend. II (securing "the right of the people to keep and bear Arms"); *see also McDonald v. Chicago*, 561 U.S. 742 (2010) (holding that the Second Amendment is incorporated against the states via the Fourteenth Amendment).

43. Because "the Second Amendment was designed to codify a 'pre-existing' individual right and guard against its later erosion by majoritarian legislation or judicial fiat," *Hemani*, 2026 WL 1751710, at *5 (quoting *Bruen*, 597 U.S. at 25), a state must "justify" any law that regulates that conduct "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation," *id.* at *4 (quoting *Bruen*, 597 U.S. at 24). To do so, a state must

show that the challenged restriction is "'relevantly similar'" "in purpose and operation" to "'well-established'" historical analogues. *Id.* at *5 (quoting *Bruen*, 597 U.S. at 28-30); *see Rahimi*, 602 U.S. at 692, 699. Under that rubric, "the more a modern law diverges from traditional laws in purpose and operation, the less likely it is to survive review." *Hemani*, 2026 WL 1751710, at *5.

44. 720 ILCS 5/24-3(A)(g) prevents law-abiding citizens from taking possession of the firearms they wish to keep and bear for at least 72 hours. It therefore restricts arms-bearing conduct covered by the plain text of—and "presumptively protect[ed]" by—the Second Amendment. *Bruen*, 597 U.S. at 17. Indeed, 720 ILCS 5/24-3(A)(g) prevents nearly everyone in the state ("the people") from taking possession of (and thus "keep[ing] and bear[ing]") a firearm ("Arms") for at least 72 hours, even if they pass a background check instantly, as the individual Plaintiffs here all did. *See Ortega*, 148 F.4th at 1143-45 (holding that New Mexico's materially identical law "burden[s] the right to keep and bear arms"); Offer of Judgment at 3, *Dunn* (Florida's officials agreeing that Florida's "waiting period restrictions burden the right to keep and bear arms"). The requirement that "the challenged law fall within the plain text of the Second Amendment" is thus "easily met" here, as 720 ILCS 5/24-3(A)(g) "burdens those wishing to exercise their Second Amendment right." *Wolford*, 2026 WL 1825723, at *9.

45. No more is required to shift the burden to the state to justify its restriction on arms-bearing conduct. *See id.* at *9-10. Nevertheless, it is worth noting that 720 ILCS 5/24-3(A)(g) does not "impose a condition or qualification like other" longstanding commercial restrictions that may enjoy a presumption of validity in light of their pedigree. *Ortega*, 148 F.4th at 1147. Laws that simply prohibit the transfer of a firearm for a period of time—whether permanently or temporarily—do not impose a condition on the sale of arms at all. In point of fact, *Black's Law Dictionary* explicitly defines the term "condition precedent" to exclude "a lapse of time."

Condition, *Black's Law Dictionary* (12th ed. 2024) ("An act or event, *other than a lapse of time*, that must exist or occur before a duty to perform something promised arises." (emphasis added)). In short, a law that outright forbids a law-abiding citizen from taking possession of a firearm is a prohibition of, not a condition on, sale, regardless of how long the prohibition lasts—as the Tenth Circuit made clear in holding New Mexico's materially identical statute unconstitutional. *Ortega*, 148 F.4th at 1147.

46.      Regardless, even if 720 ILCS 5/24-3(A)(g) were considered a presumptively lawful condition of commercial sale, any such presumption would be rebutted, because this statute is the definition of a law put toward abusive ends. 720 ILCS 5/24-3(A)(g) does not restrict sales based on some objective quality tethered to who the legislature thinks is a responsible citizen—*e.g.*, whether she is of a certain age or has passed a background check. *See Bruen*, 597 U.S. at 38 n.9. So, unlike laws prohibiting sales to minors or prohibiting possession by felons, Illinois's cooling-off law does not distinguish from the general public *either* people found to pose a threat based on individualized conduct *or* a subset of people who as a class are thought particularly likely to act violently or impulsively. *Cf. Hemani*, 2026 WL 1751710, at *10 (finding inconsistent with historical tradition a restriction on possession that does not "confine[] its reach to those who are categorically and unusually dangerous"). Instead, 720 ILCS 5/24-3(A)(g) "broadly restrict[s] arms use by the public generally," *Rahimi*, 602 U.S. at 698, based on the view that everyone who wants to exercise their Second Amendment rights should be treated with suspicion. That is precisely what it means for a law that restricts arms-bearing conduct to be "put toward an abusive end." *Ortega*, 148 F.4th at 1149 n.7 ("A supposed condition or qualification that applies as broadly as this one, put toward an end that is justified only by assuming that citizens cannot be trusted with their own rights, is put toward an abusive end."); *see also id.* at 1150 n.10 ("To say that a desire to

purchase a firearm renders one dangerous or presumptively not law-abiding for a time would also penalize someone for exercising a constitutional right, which is obviously unconstitutional."). As the Seventh Circuit recently underscored, if the state wants to disarm someone—even if only for a "limit[ed]" "time"—then it must establish "the defendant's current danger to others" through "'individualized proof.'" Slip op. 3, 10, *United States v. Rose*, No. 24-1086, --- F.4th ----, ---- (7th Cir. July 2, 2026); *see also United States v. Daniels*, 101 F.4th 770, 778 (10th Cir. 2024) ("[I]f we are to take seriously the normative thrust of the Supreme Court's recent decision[s] …, then we cannot look with suspicion on citizens presumably exercising their Second Amendment rights in a lawful way.").

47.     Finally, 720 ILCS 5/24-3(A)(g) is inconsistent "with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. There is no longstanding tradition in this country of forcing law-abiding citizens to wait to acquire firearms. To be sure, some historical laws sought to delay or prevent firearm acquisition by certain classes of individuals—whether they be people who were intoxicated (for obvious reasons), people subject to individualized determinations of dangerousness (also for obvious reasons), or people comprising disfavored minorities (for obviously odious reasons). But none of those laws imposed the sort of population-wide burden on keeping and bearing arms that 720 ILCS 5/24-3(A)(g) foists on all Illinoisans. Likewise, while some states adopted waiting-period laws in the early- and mid-twentieth century, those laws were imposed to facilitate background checks or other investigatory efforts to determine whether someone is prohibited from possessing a firearm. Unadorned "cooling-off period" laws such as 720 ILCS 5/24-3(A)(g), by contrast, are not tethered to any such efforts; they simply delay the exercise of Second Amendment rights for the sake of delay, on the theory that even law-abiding citizens who have passed a background check cannot be trusted with

20

a firearm. So, even assuming that twentieth-century waiting-period laws designed to facilitate background checks could be justified on the basis of a tradition that requires individuals to demonstrate their law-abiding character before taking possession of an arm, "cooling-off period" laws like Illinois's—which did not come about for nearly another half century—not only address a fundamentally different "how" and "why," but are fundamentally incompatible with the Second Amendment. In short, "the government cannot meet its burden to establish a historical tradition of regulation that justifies an arbitrary waiting period unconnected to the time required to complete a background check." Offer of Judgment at 3, *Dunn*; *accord Ortega*, 148 F.4th at 1150-56 (holding that New Mexico's materially identical law is unlike any "supposed historical analogues" the state could muster).

48.     Because 720 ILCS 5/24-3(A)(g) is not "consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 24, it violates the Second Amendment.

### PRAYER FOR RELIEF

Wherefore, Plaintiffs pray that this Court:

1.     declare that 720 ILCS 5/24-3(A)(g) violates the Second Amendment both on its face and as applied to law-abiding citizens who pass a background check in less than 72 hours;

2.     permanently enjoin enforcement of 720 ILCS 5/24-3(A)(g);

3.     award costs and attorneys' fees pursuant to 42 U.S.C. §1988 and any other applicable statute or authority; and

4.     provide any other and further relief as the Court may deem just and appropriate.

Respectfully submitted,

s/ David G. Sigale
David G. Sigale
**Law Firm of David G. Sigale, P.C.**
55 West 22nd Street, Suite 230
Lombard, IL 60148
630.452.4547
dsigale@sigalelaw.com

Michael D. McCoy[*]
**Mountain States Legal Foundation**
2596 South Lewis Way
Lakewood, CO 80227
(303) 292-2021
mmccoy@mslegal.org

Erin E. Murphy[*]
Matthew D. Rowen[*]
Kevin Wynosky[*]
**Clement & Murphy, PLLC**
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com
matthew.rowen@clementmurphy.com
kevin.wynosky@clementmurphy.com

Joseph G.S. Greenlee[*]
**NRA – Institute for Legislative Action**
11250 Waples Mill Road
Fairfax, VA 22030
(703) 267-1161
jgreenlee@nrahq.org

***Attorneys for Plaintiffs***

[*] *pro hac vice* applications forthcoming

July 7, 2026

22